**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| **JANET WILLIAMS AND DAVID WILLIAMS, H/W** | Case No. |
| *Plaintiff*, | |
| v. | |
| **NATIONAL RAILROAD PASSENGER CORPORATION a/k/a AMTRAK** | **JURY TRIAL DEMANDED** |
| And | |
| **BNSF RAILWAY COMPANY** | |
| And | |
| **MS CONTRACTING, LLC** | |
| *Defendants*. | |

COMES NOW, Plaintiffs, Janet Williams and David Williams, h/w, by their undersigned counsel, and makes the following Complaint against Defendants, National Railroad Passenger Corporation a/k/a Amtrak ("Amtrak"), BNSF Railway Company ("BNSF"), and MS Contracting, LLC ("MS Contracting") and alleges as follows:

## INTRODUCTION

1. At approximately 12:43 pm on June 27, 2022, Amtrak Southwest Chief Train 4 catastrophically derailed after colliding with a dump truck at a passive, uncontrolled, and dangerous crossing in Mendon, Missouri.

2. This tragedy claimed the lives of four people and injured over 150, including Plaintiff, Janet Williams, who suffered devastating and life-altering injuries.

1

3.     Amtrak Southwest Chief Train 4, a two locomotive, eight passenger car train, departed from Los Angeles, California on June 26, 2022.  At the time of the derailment there were approximately 275 passengers and 12 crew members on board.

4.     At the time of the derailment, Southwest Chief Train 4 was dangerously overcrowded far beyond its safe capacity.  This was intentionally and knowingly done by Amtrak.

5.     As Southwest Chief Train 4 approached Kansas City, Amtrak announced to the passengers planning to get off the train in Kansas City to make a connecting train would miss the connection and they should remain on the train.  However, Amtrak also announced that all passengers scheduled to board the train in Kansas City would be allowed to do so despite the train already being at full capacity.  As a result, Amtrak instructed all passengers on the train prior to Kansas City to clear out of the observation car and other common areas so that the passengers boarding in Kansas City could be packed into the observation car and common areas along with their luggage.

6.     Had Amtrak acted safely and limited the number of people permitted on the train, Amtrak would have had to refund the tickets of those not permitted to board.

7.     ***Amtrak thus intentionally and knowingly overcrowded the train in the name of profits and increased ticket sales and at the direct expense of passenger safety.***

8.     Throughout the entire journey, Southwest Chief Train 4 was traveling on tracks owned, operated and maintained by Defendant BNSF and passing through hundreds, if not thousands, of crossings controlled, operated, and maintained by Defendant BNSF, including the subject passive crossing.

9.     Upon information and belief, Amtrak Southwest Chief Train 4 was traveling at approximately 89 miles per hour when its operating engineer first observed the MS Contracting

dump truck approaching and/or in the crossing, and yet the train had slowed by only two miles per hour, to 87 miles per hour, by the time it violently struck the truck.

10.     After striking the MS Contracting truck, both locomotives and all eight passenger cars of the Southwest Chief derailed and all eight passenger cars, including the car in which Plaintiff was located, were flipped onto their sides where they ground to a halt.

11.     Janet Williams sustained significant and life-altering injuries when the passenger car she was in derailed and flipped onto its side, launching Plaintiff from her seat and throwing her violently onto the side of the train.

12.     Plaintiff lay helplessly at the bottom of the overturned train car as other passengers and luggage fell on top of her.

13.     This accident and the death and destruction it caused was entirely preventable. Sadly, the June 27, 2022 derailment of Southwest Chef Train 4 is but another in a long list of devastating and fatal train derailments caused by the negligence and carelessness of Defendants Amtrak and BNSF.





14.     The passive crossing where this tragedy occurred is exceedingly dangerous, and Defendants BNSF and/or Amtrak have known for years.  Upon information and belief, Defendants BNSF and/or Amtrak have received numerous warnings and notices concerning the subject passive crossing and its danger and pleas to upgrade it with critical life-saving protective devices.

15.     BNSF and/or Amtrak ignored these pleas for safety and continued to subject innocent passengers to extreme and unacceptable danger, as well as members of the public who attempt to navigate this dangerous passive crossing.

16.     Investigations led by the National Transportation Safety Board ("NTSB") are currently underway.  The NTSB has confirmed that the entities involved in this tragedy are Amtrak, BNSF, and MS Contracting, whose conduct is being examined along with extensive on-site examination of the tracks, grade crossing, and train cars involved in the accident.  The NTSB is also interviewing Amtrak, BNSF, and MS Contracting personnel.

## PARTIES

17.     Plaintiffs, Janet Williams and David Williams, h/w, are adult individuals and residents of the State of Iowa, residing at 1055 Valentine Drive, Dubuque, Iowa.

18.     At the time of the derailment, Janet was returning home from a trip to New Mexico to babysit her grandchildren while their parents were on an overseas trip.

19.     Janet boarded Amtrak Southwest Chief Train 4 in Gallup, New Mexico intending to travel to Galesburg, Illinois where her husband, Plaintiff David Williams, would pick her up to drive home to Dubuque, Iowa.

20.     Defendant, National Railroad Passenger Corporation a/k/a Amtrak ("Amtrak"), is a corporation organized and existing under the laws of the United States of America with its principal place of business located at 60 Massachusetts Avenue, Washington, D.C. 20002.

4

21.     At all times relevant hereto, Defendant Amtrak, by and through its railroad interests, has carried out, and continues to carry out, substantial, continuous, and systematic business activities within the state of Missouri, and has purposely established significant contacts within Missouri.

22.     At all times relevant hereto, Defendant Amtrak was acting by and through its employees, servants, agents, workmen, and/or staff, all of whom were acting within the course and scope of their employment, for and on behalf of Defendant Amtrak.

23.     The injuries and damages alleged in this lawsuit arise out of, and are related to, Defendant Amtrak's contacts and activities in the state of Missouri.

24.     Defendant, BNSF Railway Company ("BNSF"), is a corporation or other legal entity existing under the laws of the State of Delaware, with its principal place of business located at 2650 Lou Menk Drive, Fort Worth, Texas 76131.

25.     At all times relevant hereto, Defendant BNSF, by and through its railroad interests, has carried out, and continues to carry out, substantial, continuous, and systematic business activities within the state of Missouri, and has purposely established significant contacts within Missouri.

26.     At all times relevant hereto, Defendant BNSF was acting by and through its employees, servants, agents, workmen, and/or staff, all of whom were acting within the course and scope of their employment, for and on behalf of Defendant BNSF.

27.     The injuries and damages alleged in this lawsuit arise out of, and are related to, Defendant BNSF's contacts and activities in the state of Missouri.

28.     Defendant, MS Contracting, LLC, is a limited liability company or other legal entity existing under the laws of the State of Missouri, with its principal place of business located

5

at 25851 Highway M, Brookfield, Missouri 64628 and which may be served with process through its registered agent, Michael E. Sattman, at the aforementioned address.

29.     At all times relevant hereto, Defendant Amtrak was the owner, operator, maintainer, possessor, lessor, controller and/or otherwise responsible for the care, control, and safe operation of the locomotive and passenger cars comprising the Southwest Chief Train 4 involved in the catastrophic derailment.

30.     Upon information and belief, at all times relevant hereto, Defendant BNSF was the owner, operator, maintainer, possessor, lessor, controller and/or otherwise responsible for the care and control of the train tracks and passive grade crossing where this accident occurred in Mendon, Missouri and on which Southwest Chief Train 4 was traveling at the time it was caused to derail.

31.     At all times relevant hereto, Defendant MS Contracting was the owner, operator, maintainer, possessor, lessor, controller, and/or otherwise responsible for the care and control of the dump truck which was struck by Amtrak Southwest Chief Train 4 at the time of the derailment.

<u>JURISDICTION AND VENUE</u>

32.     This Court has jurisdiction over Plaintiff's action pursuant to 28 U.S.C. § 1332(a) as the amount in controversy exceeds the jurisdictional threshold, exclusive of costs, is between citizens of different states, and has jurisdiction over Defendants because the Defendants each have certain minimum contacts with the State of Missouri such that the maintenance of the suit in this district does not offend traditional notions of fair play and substantial justice, and because the injuries and damages alleged herein arise out of, and are related to, Defendants' contacts and activities in the State of Missouri.

33.     This Court has general jurisdiction over Defendant MS Contracting because it is incorporated in Missouri and has its principal place of business in Missouri.

34.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1349, as the United States is the owner of more than one-half of Defendant Amtrak's capital stock.

35.     Venue is proper in the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b) as a substantial portion of the acts, omissions, and events giving rise to Plaintiff's claim occurred in and around this district.

### THE CATASTROPHIC DERAILMENT OF SOUTHWEST CHIEF TRAIN 4

36.     Amtrak advertises the journey of the Southwest Chief as an "adventure" where passengers will travel "through the vast expanse of the fabled American West" and "be mesmerized by this region's beauty and allure."

37.     Janet put her life in Defendants' hands as she set out on her journey home.  This trust was misplaced.

38.     From the outset of Janet's trip, it was apparent that Southwest Chief Train 4 was overcrowded with passengers and luggage.

39.     Upon information and belief, not only was every seat filled but Amtrak allowed so much luggage to be brought onto the train that the designated luggage car could not hold it all, and Amtrak placed excess luggage in the passenger car lounges.

40.     On June 27, 2022 as Southwest Chief Train 4 approached its stop in Kansas City, Missouri, Amtrak announced to passengers on the train that anyone who was planning to get off the train in Kansas City to make a connecting train would miss their connection and Amtrak instructed those passengers to remain on the train.

41.     Several passengers attempted to deboard the train but were not permitted to do so.

42.     Despite the train already being filled to near or over capacity and instructing passengers to remain on the train who were supposed to get off, Amtrak outrageously allowed additional passengers to board the train in Kansas City.

43.     Amtrak knew it was overcrowding the train and instructed all passengers to clear out of the observation car and return to their assigned seats prior to arriving in Kansas City so that the additional passengers boarding in Kansas City and their luggage could be packed into the observation car, despite knowing that this would overcrowd the train beyond its safe capacity.

44.     ***Amtrak thus intentionally overcrowded the train and knowingly subjected its passengers, including Plaintiff, to harm.***

45.     ***Amtrak's intentional decision to overcrowd the train with passengers and luggage beyond its safe capacity was motivated purely by the desire to sell more tickets and reap greater profits at the expense of passenger safety***.

46.     Upon information and belief, the remainder of the journey felt different to passengers based on the cattle-car overcrowding of the train.

47.     Amtrak knew or should have known that overcrowding the train with passengers and luggage would expose the passengers to a greatly increased risk of harm and additional and magnified injuries or deaths in the event of an accident or derailment.  This is precisely what occurred.

48.     On June 27, 2022, at approximately 12:43 p.m., Southwest Chief Train 4 approached a passive grade crossing at Porche Prairie Avenue in Mendon, Missouri (hereinafter referred to as the "Porche Prairie Crossing") while traveling at approximately 89 miles per hour.

49.     At the same time, an MS Contracting dump truck involved in transporting aggregate stone to a nearby Army Corps of Engineers project approached the Porche Prairie Crossing intending to cross over the tracks.

50.     The Porche Prairie Crossing is a passive grade crossing, meaning that it has no critical safety devices such as lights, crossing arms, or anything whatsoever that would alert motorists or pedestrians to high-speed trains barreling down the tracks.  The Porche Prairie Crossing was equipped only with crossbucks and a stop sign.

51.     Further compounding the danger of the Porche Prairie Crossing was the extremely steep approach to the crossing and unkept vegetation surrounding the crossing and the tracks which severely restricted sight lines and distances.

52.     As Southwest Chief sped towards the Porche Prairie Crossing at 89 miles per hour, upon information and belief the locomotive's engineer observed the MS Contracting truck approaching and/or in the crossing when the train was approximately a quarter mile out from the crossing and blew its horn.

53.     The subject MS Contracting dump truck was a specific, individual hazard that Defendant Amtrak had a duty and obligation to avoid by immediately and dramatically reducing its speed.

54.     Furthermore, upon observing the subject MS Contracting dump truck approaching and/or in the Porche Prairie Crossing, Defendant Amtrak's operating engineer and/or train crew knew or should have known that collision was imminent as a result of the MS Contracting dump truck's unwavering approach to the crossing.

55.     Despite this, the Amtrak operating engineer only slowed the train by a miniscule two miles per hour and slammed into the back portion of the MS Contracting dump truck at approximately 87 miles per hour.

56.     Had the Amtrak operating engineer appropriately applied the brake this would have allowed the MS Contracting truck to clear and the tragedy would not have occurred.

57.     At the moment Amtrak Southwest Chief Train 4 impacted the subject MS Contracting dump truck with devastating force, Plaintiff, Janet Williams, was launched out of her seat and thrown forward.

58.     Upon information and belief, when Southwest Chief Train 4 struck the MS Contracting dump truck, a portion of the dump truck was pulled underneath the leading locomotive and caused significant damage to the tracks.

59.     Southwest Chief Train 4's two leading locomotives derailed and caused all eight trailing passenger cars, including the car in which Plaintiff was located, to not only derail but flip onto their sides and drag across the stone ballast and harsh Missouri landscape before coming to a grinding halt.

60.     Upon information and belief, the Amtrak Southwest Chief was equipped with tightlock couplers which connected the eight passenger cars together.  As a result of this coupling system once the first train car derailed and flipped it caused a chain reaction which caused all of the trailing passenger cars to flip onto their sides as well.



61.     When Plaintiff's train car was thrown from the tracks and flipped onto its side numerous passengers, including children, fell from the opposite side of the train car and landed on Plaintiff, crushing her and causing immense physical pain.

62.     Smoke and dust billowed into the train car and once other passengers were pulled off of Plaintiff and she was able to gain her senses, she observed the horrific devastation surrounding her as terrified and injured passengers sought an exit from the flipped train car.

63.     Unlike many passenger buses that are equipped with exit hatches in the roof, Amtrak Southwest Chief Train 4 had no such exit hatches or any means of exiting the train car other than through the side windows, one of which was smashed against the ground and the other required passengers to treacherously scale the interior structures of the flipped train car.



64.     Plaintiff was unable to make the climb up to the windows and so she was terrifyingly trapped in the flipped train car, helpless and unable to do anything but pray.

65.     Eventually, a fellow passenger located a sledgehammer and smashed open one of the bottom windows to reveal small exit where there was just enough space between the train car and the ground to get out.

66.     Plaintiff was helped through that exit space, terrified that the train would tip further and crush her before she could get to safety.



67.     After escaping the overturned train car, Plaintiff climbed the steep embankment up onto the tracks and observed the immense scale of this disaster—every single train car was derailed and flipped and fellow passengers were bloodied and broken.

68.     Emergency first responders tended to Plaintiff and immediately transported her to a local high school where she was triaged and a neck brace was applied before she was taken to the hospital for treatment of her painful injuries.

69.     This tragedy and the immense destruction and suffering inflicted on Plaintiff, her and many others, should have never happened.

### THE UNACCEPTABLY DANGEROUS PORCHE PRAIRIE CROSSING

70.     The Porche Prairie Crossing was unacceptably dangerous in numerous respects, and Defendants BNSF and/or Amtrak knew it for years.

13

71.     The Porche Prairie Crossing was a passive crossing that was not equipped with any of the critical safety devices necessary for the protection of train passengers and motorists attempting to cross the tracks.

72.     For decades, the NTSB has urged the elimination of passive crossings by either converting them to active crossings with the installation of critical safety equipment like crossing arms, lights, or bells, or consolidating crossings.

73.     Passive crossings like the Porche Prairie Crossing are dangerous and subject innocent and helpless train passengers and motorists to extreme and unacceptable safety hazards every single day.

74.     Defendants BNSF and Amtrak knew or should have known that the Porche Prairie Crossing was dangerous and in dire need of safety upgrades.

75.     The Porche Prairie Crossing was known to be dangerous and plans were developed to upgrade the crossing to an active crossing through the installation of lights, gates, and roadway improvements.

76.     The Missouri State Freight & Rail Plan, 2022, explicitly identifies the BNSF Porche Prairie Crossing as one that would receive the critical safety upgrades:

| Proposed Program | Description | Corridor/ Location | Need Addressed[1] |
|---|---|---|---|
| BNSF Railway | | | |
| *** | | | |
| Crossing Safety Improvements, County Road 113/Porche Prairie Road | Installation of lights and gates and roadway improvements at public crossing 005284Y | Mendon | |
| *** | | | |
| Chariton County—Roadway Approach Improvements | Improvements to the roadway approaches at 3 public crossings: Atchison Avenue, Snyder Avenue, and Porche Prairie Avenue | | |
| *** | | | |

14

| Project Title | Need Addressed | Project Description | Estimated Capital Cost ($YOE in Millions) | Funding Levels ($YOE in Millions) 1) Nonpublic 2) Federal 3) Non-Federal | Funding Sources 1) Nonpublic 2) Federal 3) Non-Federal |
|---|---|---|---|---|---|
| Medill—Crossing Safety Improvements, County Road 134 | Safety and Crossings | Roadway safety improvements at public crossing 005019J | | $0.09 | Section 130 |
| | | | | $0.01 | GCSA |
| Mendon—Crossing Safety Improvements, County Road 113/ Porche Prairie Road | Safety and Crossings | Installation of lights and gates and roadway improvements at public crossing 005284Y. | $0.4 | $ — | — |
| | | | | $0.325 | Section 130 |
| | | | | $0.075 | GCSA |
| | | *** | | | |
| Triplett—Roadway Approach Improvements | Safety and Crossings | Improvements to the roadway approaches at 3 public crossings: Atchison Avenue, Snyder Avenue, and Porche Prairie Avenue | $0.4 | $ — | — |
| | | | | $0.36 | Section 130 |
| | | | | $0.04 | GCSA |

77.    Further, a recent draft multimodal operations report identifies the BNSF Porche Prairie Crossing as one that was planned to undergo installation of lights and gates and roadway improvements, and that it would cost $400,000 funded by both the state and federal governments:

| District: | NW | Install lights and gates and roadway improvements at public BNSF railroad crossing 005284Y | | |
|---|---|---|---|---|
| County: | Chariton | | | |
| City: | Mendon | Federal: | State: | Local: |
| Street: | Co Rd 113 / Porche Prairie Rd | 325 | 75 | 0 |
| | | Estimate Total: | 400 | |

78.    Although the federally funded safety improvements to the Porche Prairie Crossing were planned, they were not implemented or operational prior to or at the time of the catastrophic derailment.

79.    Even though the state and federal governments were planning these critical safety upgrades to the Porche Prairie Crossing, the crossing was owned by BNSF and BNSF's cooperation was necessary in order to make the improvements.

80. Upon information and belief, BNSF dragged its feet in moving through the process that would allow for these monumentally important safety upgrades to be made.

81. BNSF's delay in working to implement these safety upgrades is outrageous and inexcusable in light of the fact that, upon information and belief, BNSF had been notified numerous times of the dangers presented by the Porche Prairie Crossing by concerned citizens and local government.

82. BNSF knew or should have known that failing to timely make necessary and critical safety upgrades to the Porche Prairie Crossing would expose passengers traveling on its rails and motorists to an extreme and unacceptable risk of severe injury and/or death.

83. Despite this aforementioned knowledge and despite receiving numerous complaints and notices regarding the dire need for safety improvements at the Porche Prairie Crossing, BNSF refused to timely respond and failed to make the necessary safety improvements.

84. BNSF's failure to make these changes it knew were necessary was reckless and outrageous and, upon information and belief, it was driven purely by a desire to save expenses and not commit the resources necessary to upgrade this crossing, despite assistance from state and federal governments.

### DEFENDANTS' LONG HISTORY OF DEVASTATING DERAILMENTS

85. The investigation of this tragedy is at its early stages, however, upon information and belief, Southwest Chief Train 4 failed to appropriately slow the train prior to colliding with the MS Contracting dump truck.

86. Upon information and belief, the train struck the back end of the MS Contracting truck, and had Amtrak appropriately responded to the specific, individual hazard presented by the MS Contracting truck and immediately applied the emergency brakes and slowed the train as much

as possible, it would have provided enough time for the MS Contracting truck to finish crossing the tracks and clear out of the way and this tragedy would have been avoided.

87.    Upon information and belief, the Amtrak operating engineer failed to appropriately respond and failed to appropriately slow the train.

88.    ***Furthermore, upon information and belief the injuries suffered by passengers, including Plaintiff, were dramatically magnified and exacerbated as a direct and predictable result of Amtrak's reckless and outrageous intentional decision to overcrowd the train beyond its safe capacity***.

89.    As a result of Amtrak's intentional decision to overcrowd the train beyond its safe capacity, there were more people and more luggage on the train that were violently thrown around during the derailment, smashing into other passengers, including Plaintiff, and causing additional and magnified injuries.

90.    ***Even more outrageously, Amtrak has plans and procedures in place directing its train crews to intentionally overcrowd trains and pack passengers into standing room only situations which knowingly subject all passengers to harm***.

91.    This tragedy occurred due to the systematic failures of Amtrak to have an adequate culture in place to ensure safety on its railways.

92.    The June 27, 2022 Amtrak Southwest Chief Train 4 derailment is the latest chapter in Amtrak's long history of tragic train accidents and culture of disregard for the safety and lives of its passengers.

93.    On May 12, 2015, Amtrak Train 188 derailed near Philadelphia, Pennsylvania, killing eight passengers and injuring over 200.



94.     On March 14, 2016, the Amtrak Southwest Chief Train derailed near Cimarron, Kansas, injuring 28 passengers.



95.     On April 3, 2016, Amtrak Train 89, known as the Palmetto, struck a backhoe and derailed just south of Philadelphia, Pennsylvania, killing two.



96.     On December 18, 2017, the Amtrak Cascades Train 501 derailed near DuPont, Washington, killing three and injuring 65 passengers.



97.     On February 4, 2018, Amtrak Regional Rail Train 91 train failed to properly navigate a railroad switch near Cayce, South Carolina and collided with a freight train, killing two and injuring scores of passengers.



98.     On September 25, 2021, Amtrak Empire Builder Train 7/27 derailed outside of Joplin, Montana killing three and injuring dozens.



99.     Tragically, Amtrak has failed to learn from these prior deadly accidents and has continuously failed to ensure that its trains are operated safely and continues to put passengers at risk of catastrophic injury and death each time they board an Amtrak train.

100.    Amtrak and BNSF owed the highest duty of care to the passengers aboard Southwest Chief Train 4, including Janet Williams, to ensure that the train is operated properly and safely, that all tracks and equipment are in good working condition, that all crossings are safe and well protected, and critically, that passengers are not placed into dangerous conditions as a result of Amtrak's desire to sell more tickets, reap greater profits, and pack the trains as full as possible at the direct expense of safety.

101.    Defendants Amtrak and BNSF failed to fulfill their aforementioned duties and caused the catastrophic derailment of Amtrak Southwest Chief Train 4 on June 27, 2022 and the immense injuries and suffering inflicted on passengers.

102.    During the derailment of Southwest Chief Train 4, Plaintiff Janet Williams was battered, bruised, and psychologically scarred for life.

103.   As a direct and proximate result of Defendants, Amtrak's, BNSF's, and MS Contracting's carelessness, negligence, gross negligence, recklessness and other liability-producing conduct, Plaintiff, Janet Williams, suffered serious, severe and disabling injuries including but not limited to, sprains and strains, abrasions, contusions, concussion with post concussive syndrome and symptoms, and other orthopedic, neurological, and psychological injuries, the full extent of which has yet to be determined.  Plaintiff suffered significant injuries to her neck, back, left hand, right shoulder, and hip, as well as severe emotional and psychological trauma and post-traumatic stress disorder and unrelenting pain.  Plaintiff has in the past and may in the future require medicines, medical care and treatment; she has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment; she has in the past and may in the future continue to suffer agonizing aches, pains and mental anguish; she has in the past and may in the future continue to be disabled from performing her usual duties, occupations and avocations, all to her great loss and detriment.

a.   As a direct and proximate result of Defendants' carelessness, negligence, gross negligence, recklessness and other liability-producing conduct, Plaintiff, Janet Williams, has in the past required, continues to require, and may in the future require medical treatment and care, and has in the past, continues presently, and may in the future incur the cost of medicines, medical are, hospitalizations, treatment, future operations, testing, and rehabilitation in an attempt to alleviate and/or cure her condition(s).

b.   As a direct and proximate result of Defendants' carelessness, negligence, gross negligence, recklessness and other liability-producing conduct, Plaintiff, Janet Williams, has in the past and continues to suffer pain, disfigurement, loss of

independence, mental anguish, humiliation, embarrassment, fear, loss of well-being, inability to enjoy the normal pleasures of life, and restrictions on her ability to engage in normal activities and pleasures of life, and other intangible losses.

c.      As a direct and proximate result of Defendants' carelessness, negligence, gross negligence, recklessness and other liability-producing conduct, Plaintiff, Janet Williams, has been prevented and will be prevented in the future from performing her usual duties, activities, occupations and avocations and has suffered a loss of earnings and a loss of earning capacity.

104.    The injuries and damages suffered and claimed by Plaintiff were caused solely by the acts of Defendant Amtrak, Defendant BNSF, and/or Defendant MS Contracting, jointly and/or individually and/or through their joint and individual agents, servants, workmen and/or employees as set forth herein, and not through any act or omission on Plaintiff's part.

105.    Plaintiffs are not specifying any monetary demand at this time except to say that the amount in controversy exceeds all applicable jurisdictional thresholds.   Plaintiffs are demanding Amtrak and BNSF make necessary safety improvements to ensure tragedies like this don't continue to happen.

106.    Defendants Amtrak, BNSF, and MS Contracting are jointly and severally liable for the injuries and damages suffered by Plaintiff.

## CLAIMS ALLEGED

## COUNT I – NEGLIGENCE

## PLAINTIFF v. NATIONAL RAILROAD PASSENGER CORPORATION a/k/a AMTRAK

107.    All preceding paragraphs of this Complaint are incorporated herein by reference the same as though fully set forth herein.

22

108.    Defendant Amtrak was the owner, operator, maintainer, possessor, lessor, controller and/or otherwise responsible for the care, control, and operation of Southwest Chief Train 4 involved in this accident.

109.    As the owner and operator of Southwest Chief Train 4, Defendant Amtrak had a duty to ensure that the train was operated safely, carefully, and competently and in such a way so as to not endanger its passengers and had a duty to hire, train and/or retain competent personnel to operate its locomotives, including the locomotive involved in this accident.

110.    Amtrak had a duty to ensure that the train was not oversold or overcrowded beyond its safe capacity.

111.    Amtrak had a duty to ensure that all rail lines on which its trains traveled were in good and safe condition and would not pose a danger or hazard to the passengers on Amtrak's trains, especially on the Southwest Chief Train which had previously derailed.

112.    Amtrak had a duty to ensure that Southwest Chief Train 4 was properly inspected and maintained in good and safe condition and was capable of safely completing its journey without endangering the passengers aboard.

113.    Amtrak had a duty to ensure that Southwest Chief Train 4 was adequately crashworthy and capable of protecting its passengers in the event of a derailment or crash.

114.    Amtrak owed its passengers, including Plaintiff, the highest duty of care under the law to ensure their safety during their travels.

115.    The operator of Southwest Chief Train 4 had a duty to observe specific, individual hazards on the tracks and take immediate and appropriate action to prevent collision therewith.

116.    Defendant Amtrak and its operating engineer had a duty and responsibility to observe hazards approaching and/or in the crossing and appropriately and timely apply the brake.

117. Plaintiff and other passengers on Southwest Chief Train 4 trusted Amtrak with their lives as they rode as passengers on the train with no ability to control the operation themselves or prevent this catastrophic derailment.

118. Defendant Amtrak breached these aforementioned duties and as a result, caused this derailment and the injuries and damages alleged herein.

119. Amtrak, by and through its employees and/or agents, caused the injuries and damages sustained by Plaintiff and acted carelessly, negligently, grossly negligently, recklessly, and outrageously through the following actions and/or inactions:

    a.    Intentionally overcrowding the Southwest Chief Train 4 beyond its safe capacity;

    b.    Operating the Southwest Chief Train 4 too fast for the conditions then and there existing;

    c.    Failing to slow down as the Southwest Chief Train 4 approached the specific, individual hazard presented by the MS Contracting truck;

    d.    Failing to appreciate the hazard posed by the MS Contracting truck;

    e.    Improperly and/or unsafely traversing the area in the vicinity of the Porche Prairie Crossing;

    f.    Failing to appreciate the dangerous condition of the Porche Prairie Crossing;

    g.    Failing to properly inspect, maintain, and/or repair the tracks on which the Southwest Chief Train 4 was traveling;

    h.    Failing to properly inspect, maintain, upgrade, and/or repair the crossings through which Southwest Chief Train 4 traveled, including the Porche Prairie Crossing;

    i.    Failing to observe, appreciate, and/or correct the hazardous conditions which caused this derailment;

    j.    Failing to ensure that the tracks on which the Southwest Chief Train 4 was traveling were in good and safe condition prior to the derailment;

    k.    Failing to ensure that its passenger train cars were crashworthy;

    l.    Failing to design, install, implement, and/or equip the subject train with devices and/or mechanisms that would prevent anything struck by the train, including the MS Contracting truck, from getting pulled underneath the train and causing derailment;

m.   Utilizing a train coupling system that resulted in a chain reaction that caused all passenger train cars to derail and flip onto their sides;

n.   Failing to timely perform inspections, maintenance, and/or repairs to the railroad tracks at the location of the accident;

o.   Failing to safely navigate the tracks leading up to and at the location of the derailment;

p.   Failing to observe and appropriately respond to hazards on the track;

q.   Failing to appropriately respond to the rail conditions prior to the accident;

r.   Failing to stop the train before operating it into the MS Contracting truck;

s.   Failing to significantly slow the speed of the train before colliding with the MS Contracting truck;

t.   Failing to enact and enforce policies and procedures to prevent overcrowding of its trains, including Southwest Chief Train 4, beyond the safe capacity;

u.   Enacting and enforcing policies and procedures which required train crews to intentionally overcrowd the train beyond its safe capacity;

v.   Enacting and enforcing policies and procedures which required train crews to intentionally overcrowd the train beyond its safe capacity despite knowing that such policies and procedures would subject passengers, including Plaintiff, to an extreme and unacceptable risk of severe injury and/or death;

w.   Failing to adequately communicate and coordinate with Defendant BNSF regarding the condition of the tracks on which the Southwest Chief Train was traveling and all crossings through which the train traveled;

x.   Failing to adequately communicate and coordinate with Defendant BNSF regarding inspection, maintenance, and upkeep of the tracks on which the Southwest Chief Train was traveling;

y.   Failing to adequately train the operator and crew of the Southwest Chief Train;

z.   Hiring incompetent operators, engineers and/or crew to operate the Southwest Chief Train;

aa.   Failing to properly inspect the Southwest Chief Train;

bb.   Failing to timely apply the emergency brakes;

cc.   Colliding with the MS Contracting truck;

dd.   Failing to observe, appreciate, appropriately respond to and/or correct the hazardous condition(s) of that caused and/or contributed to this derailment;

ee.   Failing to ensure that the Southwest Chief Train was equipped with all appropriate, necessary, and adequate Positive Train Control systems;

ff.     Failing to ensure that all crossings through which the Southwest Chief Train was traveling through were equipped with all appropriate, necessary, and adequate Positive Train Control systems;

gg.     Violating governmental statutes, regulations, and requirements with respect to the train and train system in question;

hh.     Allowing improperly trained, incompetent and unqualified personnel to operate the Southwest Chief Train;

ii.     Failing to comply with Amtrak's own safety, operating, and other rules, procedures, and regulations;

jj.     Failing to adequately maintain the tracks upon which its train was traveling;

kk.     Failing to adequately maintain the Porche Prairie Crossing;

ll.     Failing to adequately inspect the tracks upon which its train was traveling;

mm.     Failing to have adequate rules and procedures in place to prevent this tragedy from occurring;

nn.     Promoting and maintaining a culture of safety ignorance and noncompliance;

oo.     Failing to comply with the rules of the Northeast Operating Rules Advisory Committee;

pp.     Failing to comply with the Rail Safety Improvement Act; and

qq.     Failing to comply with the Federal Locomotive Inspection Act.

120.     Through the actions and inactions described above, Defendant Amtrak is responsible for this tragedy and the injuries suffered by Plaintiff.

**WHEREFORE**, Plaintiff demands judgment against Defendant, National Railroad Passenger Corporation a/k/a Amtrak for such damages as may be permitted pursuant to applicable law, including all compensatory and punitive damages in excess of the jurisdictional threshold, together with interest, costs, and attorneys' fees, and all other relief that this Court deems just and appropriate.

## COUNT II – NEGLIGENCE

## PLAINTIFF v. BNSF RAILWAY COMPANY

121.     All preceding paragraphs of this Complaint are incorporated herein by reference the same as though fully set forth herein.

122.    Defendant BNSF owns the train tracks of the Southwest Chief line, including those in Missouri and at the location of this derailment.

123.    Defendant BNSF owns the Porche Prairie Crossing and is responsible to ensure that it is safe and equipped with all necessary safety devices.

124.    Defendant BNSF is responsible to implement needed upgrades to its crossings, including the Porche Prairie Crossing, in a timely manner.

125.    As the owner of the train tracks and crossings Defendant BNSF had a duty to inspect, maintain, and repair the train tracks and crossings and all associated components and equipment, including warning devices and signal systems, were in good and safe condition at all times.

126.    Defendant BNSF had a duty to ensure that its train tracks and crossings, including the Porche Prairie Crossing, were safe for use by passenger rail cars, including Southwest Chief Train 4.

127.    Defendant BNSF had a duty to ensure that trains, including Southwest Chief Train 4, would not be permitted to operate on tracks or through crossings that were damaged, dilapidated, in need of repair and/or safety upgrades, and/or were otherwise dangerous and hazardous.

128.    Defendant BNSF had a duty to notify and warn all companies operating passenger trains on its train tracks, including Amtrak and its Southwest Chief Train, and all of its passengers, of any tracks that were damaged, dilapidated, in need of repair, and/or were otherwise dangerous and hazardous.

129.    Defendant BNSF had a duty to ensure that its tracks and crossings, including the Porche Prairie Crossing, were equipped with all necessary equipment and technology, such as

Positive Train Control, to ensure that the passengers aboard trains traveling the tracks would be safe and protected from derailments and accidents.

130.    Defendant BNSF had a duty to repair, maintain, correct, inspect, upgrade, and otherwise be responsible for Porche Prairie Crossing.

131.    Defendant BNSF had a duty to monitor the rail conditions on the tracks that it owned and operated as well as the safety of all crossings it owned, including the Porche Prairie Crossing.

132.    Defendant BNSF breached these aforementioned duties and as a result, caused this derailment and the injuries and damages alleged herein.

133.    Defendant BNSF, by and through its agents, servants and/or employees, caused the injuries and damages sustained by Plaintiff, and acted carelessly, negligently, grossly negligently and/or recklessly through the following actions and/or inactions:

   a.    Failing to provide a reasonably safe railroad track;

   b.    Failing to provide a reasonably safe crossing, specifically the Porche Prairie Crossing;

   c.    Failing to timely implement upgrades and safety improvements to the Porche Prairie Crossing;

   d.    Failing to timely implement upgrades and safety improvements to the Porche Prairie Crossing despite receiving numerous notices and warnings of the danger that the Porche Prairie Crossing posed;

   e.    Failing to timely implement upgrades and safety improvements to the Porche Prairie Crossing despite receiving numerous notices and warnings of the danger that the Porche Prairie Crossing posed and despite knowing that such a failure would subject train passengers, including Plaintiff, to an extreme and unacceptable risk of severe injury and/or death;

   f.    Allowing its railroad tracks, crossings, and associated equipment and components, including track switches and signal systems, to exist in a dangerous, dilapidated, and dis-repaired condition;

   g.    Failing to properly and adequately inspect, maintain and/or repair the railroad tracks, crossings, and/or track systems;

h.  Failing to observe, appreciate, and/or correct the hazards that resulted in this tragedy;

i.  Failing to observe, appreciate, and/or correct the hazards that resulted in this tragedy despite having the opportunity to do for years before the derailment;

j.  Appreciating and recognizing the need for safety upgrades to the Porche Prairie Crossing but failing to timely perform said safety upgrades or ensure that no trains traveled on the tracks until such time that the safety upgrades could be made;

k.  Failing to have properly trained and competent personnel inspect the condition of the railroad tracks, crossings, and/or track system prior to this accident;

l.  Failing to ensure that the tracks on which the Southwest Chief Train were traveling and the crossings through which it was traveling were in good and safe condition prior to the derailment;

m.  Failing to timely perform inspections, maintenance, repairs, and/or safety upgrades to the railroad tracks and the Porche Prairie Crossing at the location of the accident;

n.  Failing to monitor the rail conditions and/or the crossings prior to the accident;

o.  Failing to enact and enforce policies and procedures to make timely and necessary safety upgrades at all passive crossings, including the Porche Prairie Crossing;

p.  Failing to adequately communicate with Defendant Amtrak regarding inspection, maintenance, and upkeep of the tracks and/or crossings on which the Southwest Chief Train was traveling;

q.  Failing to properly and safely operate and maintain the Porche Prairie Crossing;

r.  Failing to perform required inspections of tracks/track system/crossing question;

s.  Failure to implement proper precautions to prevent the derailment;

t.  Failing to ensure that the railroad tracks and crossings in the area of the accident were equipped with all appropriate, necessary, and adequate Positive Train Control systems and technology;

u.  Failing to warn the MS Contracting dump truck driver of the impending train;

v.  Failing to shut down the railroad tracks at the location of this accident before it occurred so that critical and necessary repairs and safety upgrades could be made to the Porche Prairie Crossing;

w.  Failing to properly and safely manage and supervise its railroad operations;

x.  Promoting and maintaining a culture of safety ignorance and noncompliance;

y.  Failing to comply with the rules of the Northeast Operating Rules Advisory Committee;

z.  Failing to adequately inspect the track in the area of this tragedy;

aa.  Failing to adequately maintain the track in the area of this tragedy;

bb.  Failing to comply with the Rail Safety Improvement Act (RSIA); and

cc.  Failing to comply with the Federal Locomotive Inspection Act.

134.  Through the actions and inactions described above, Defendant BNSF is responsible for this tragedy and the injuries to numerous passengers, including Plaintiff.

**WHEREFORE**, Plaintiff demands judgment against Defendant BNSF Railway Company for such damages as may be permitted pursuant to applicable law, including all compensatory and punitive damages in excess of the jurisdictional threshold, together with interest, costs, and attorneys' fees, and all other relief that this Court deems just and appropriate.

## COUNT III – NEGLIGENCE

## PLAINTIFF v. MS CONTRACTING, LLC

135.  All preceding paragraphs of this Complaint are incorporated herein by reference the same as though fully set forth herein.

136.  Defendant MS Contracting was the owner, operator, maintainer, possessor, lessor, controller, and/or otherwise responsible for the care and control of the dump truck which was struck by Amtrak Southwest Chief Train 4 at the time of the derailment and which was bearing VIN # 1NKWXBEX97J177480.

137.  Upon information and belief, the subject MS Contracting dump truck was involved in transporting aggregate stone to a nearby Army Corps of Engineers project.

138.     While operating said dump truck loaded with aggregate stone, Defendant MS Contracting had a duty to operate the truck safely and in such a way that would not subject others to hazards.

139.     In operating the subject dump truck over and/or through the Porche Prairie Crossing, Defendant MS Contracting had a duty to ensure that it would not proceed through the crossing unless it was safe and there were no impending trains.

140.     Despite the fact that it was unsafe, careless, and reckless to do so because of the impending Amtrak train, Defendant MS Contracting operated its dump truck into the crossing where it was struck by Amtrak Southwest Chief Train 4, causing the derailment.

141.     Defendant MS Contracting, by and through its agents, servants and/or employees, caused the injuries and damages sustained by Plaintiff, and acted carelessly, negligently, grossly negligently and/or recklessly through the following actions and/or inactions:

      a.     Failing to safely operate the subject dump truck;

      b.     Failing to keep a proper lookout for hazards and/or hazardous conditions;

      c.     Proceeding through the subject Porche Prairie Crossing despite the danger posed by the oncoming train;

      d.     Failing to take evasive action;

      e.     Failing to maintain proper control of the dump truck;

      f.     Failing to observe, hear, and heed the oncoming Amtrak train's warning signals, including the train's horn;

      g.     Failing to properly train and supervise its employees;

      h.     Failing to follow all relevant and applicable rules of the road; and

142.     Through the actions and inactions described above, Defendant MS Contracting is responsible for this tragedy and the injuries to numerous passengers, including Plaintiff.

**WHEREFORE**, Plaintiff demands judgment against Defendant MS Contracting, LLC for such damages as may be permitted pursuant to applicable law, including all compensatory and

punitive damages in excess of the jurisdictional threshold, together with interest, costs, and attorneys' fees, and all other relief that this Court deems just and appropriate.

**COUNT IV – LOSS OF CONSORTIUM**

**PLAINTIFF, DAVID WILLIAMS v. ALL DEFENDANTS**

143.    All preceding paragraphs of this Complaint are incorporated herein by reference the same as though fully set forth herein.

144.    Plaintiff, David Williams, is and was at all times relevant hereto the husband of Plaintiff, Janet Williams, and as such, is entitled to her society, companionship, and services.

145.    By reason of the Defendants' carelessness, negligence, gross negligence, and reckless and outrageous conduct, husband-Plaintiff has suffered the loss of consortium and has been deprived of his wife's love, companionship, comfort, affection, society, moral guidance, intellectual strength and physical assistance and the loss of the assistance and earnings of husband-plaintiff.

**WHEREFORE**, Plaintiff demands judgment against Defendants for such damages as may be permitted pursuant to applicable law, including all compensatory and punitive damages in excess of the jurisdictional threshold, together with interest, costs, and attorneys' fees, and all other relief that this Court deems just and appropriate

Dated: July 1, 2022                    Respectfully submitted,

*/s/ Greg G. Gutzler*

Greg G. Gutzler (Missouri Bar No. 48893)
**DICELLO LEVITT GUTZLER**
One Grand Central Place
60 East 42nd Street
Suite 2400
New York, New York 10165
Tel: (646) 933-1000
ggutzler@dicellolevitt.com

*/s/ Robert J. Mongeluzzi*

Robert J. Mongeluzzi*
Jeffrey P. Goodman*
Samuel B. Dordick*
**SALTZ MONGELUZZI & BENDESKY P.C.**
One Liberty Place
1650 Market Street, 52nd Floor
Philadelphia, Pennsylvania 19103
Tel: (215) 496-8282
rmongeluzzi@smbb.com
jgoodman@smbb.com
sdordick@smbb.com

*Applications for admission *pro hac vice* to be filed.

***Counsel for Plaintiffs***

33